## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ANTOINETTE TARCZY**
19145 Sand Piper Drive
Macomb, Michigan 48044

                    *Plaintiff*

          v.

**JOHNSON & JOHNSON**
One Johnson & Johnson Plaza
New Brunswick, NJ 08933

Serve: Registered Agent
One Johnson & Johnson Plaza
New Brunswick, NJ 08933

and

**JOHNSON & JOHNSON CONSUMER
INC. f/k/a JOHNSON & JOHNSON
CONSUMER COMPANIES, INC.**
One Johnson & Johnson Plaza
New Brunswick, NJ 08933

Serve: Registered Agent
One Johnson & Johnson Plaza
New Brunswick, NJ 08933

and

**PERSONAL CARE PRODUCTS
COUNCIL, f/k/a COSMETIC,
TOILETRY, AND FRAGRANCE
ASSOCIATION**
1620 L Street, NW, Suite 1200
Washington, DC 20036

Serve: Thomas Myers, Registered Agent
1620 L Street, NW, Suite 1200
Washington, DC 20036

                    *Defendants*

Case No.  <u>1:20-cv-1056</u>

**JURY TRIAL DEMANDED**

## COMPLAINT

COMES NOW Plaintiff Antoinette Tarczy, by and through her undersigned counsel, and for her causes of action against Defendants Johnson & Johnson, Johnson & Johnson Consumer Inc. f/k/a Johnson & Johnson Consumer Companies, Inc., and Personal Care Products Council, f/k/a Cosmetic, Toiletry, and Fragrance Association, states the following:

## INTRODUCTION

1.      This action arises out of the development of ovarian cancer by Antoinette Tarczy, as a direct and proximate result of using Johnson's Baby Powder and Shower to Shower powder (hereinafter "the PRODUCTS"), two talc-based products, in the perineal area.

## PARTIES, JURISDICTION, and VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because Defendants are incorporated and have their principal places of business in states other than the state in which the named Plaintiff resides.

3.      Venue of this case is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants are residents of this District for the purposes of venue.

4.      Further, venue of this case is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

5.      Plaintiff Antoinette Tarczy is an adult and citizen of the Michigan.

6.      Defendant Johnson & Johnson is a New Jersey corporation with its principal place of business in the State of New Jersey. At all pertinent times, Johnson & Johnson was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing the

PRODUCTS. At all pertinent times, Johnson & Johnson regularly transacted, solicited, and conducted business in the District of Columbia, including the marketing, promoting, selling, and/or distribution of the PRODUCTS.

7.     Defendant Johnson & Johnson Consumer Inc. is a New Jersey corporation with its principal place of business in the State of New Jersey. At all pertinent times, Johnson & Johnson Consumer Inc. was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing the PRODUCTS. At all pertinent times, Johnson & Johnson Consumer Inc. regularly transacted, solicited, and conducted business in the District of Columbia, including the marketing, promoting, selling, and/or distribution of the PRODUCTS.

8.     Defendants Johnson & Johnson and Johnson & Johnson Consumer Inc. have, at all pertinent times, conducted continuous and systematic business in the District of Columbia through their membership in PCPC and participation in the TIPTF, among other activities, and by placing their PRODUCTS in the stream of commerce with the knowledge and intent that they be sold in the District of Columbia and be consumed by District of Columbia citizens and residents.

9.     At all pertinent times, Defendant Johnson & Johnson Consumer Inc. has been a wholly owned subsidiary of Defendant Johnson & Johnson, under the complete dominion and control of Defendant Johnson & Johnson, and the agent and alter ego of Defendant Johnson & Johnson.  Hereinafter, unless otherwise delineated, these two entities shall be collectively referred to as the "Johnson & Johnson Defendants."

10.    Defendant Personal Care Product Council ("PCPC"), f/k/a Cosmetic, Toiletry, and Fragrance Association ("CTFA") is a corporation organized under the laws of the District of Columbia, with its principal place of business in the District of Columbia.  PCPC is the successor or continuation of CTFA, and PCPC is legally responsible for all liabilities incurred when it was

known as CTFA. At all pertinent times, PCPC was and is the national trade association that represents companies in the personal care and cosmetics industry, including the Johnson & Johnson Defendants.

## ALLEGATIONS COMMON TO ALL COUNTS

### Talcum Powder Products Generally

11.     Talc is a magnesium silicate mineral mined from the earth.

12.     Talc is the main ingredient in the PRODUCTS.   The Johnson & Johnson Defendants manufactured the PRODUCTS. During all relevant times, Johnson's Baby Powder® was composed primarily of talc along with other certain constituent elements found in talc such as asbestos, fibrous talc, and heavy metals (e.g., nickel, cadmium, cobalt, chromium), and fragrance chemicals. During all relevant times, Shower to Shower was composed of talc and cornstarch, along with other certain constituent elements found in talc such as asbestos, fibrous talc, and heavy metals (e.g., nickel, cadmium, cobalt, chromium), and fragrance chemicals.

13.     Imerys Talc America, Inc., f/k/a Luzenac America, Inc. ("Imerys Talc") is responsible for mining and distributing talcum powder for use in talcum powder based products, including the PRODUCTS. Imerys Talc is the successor or continuation of Luzenac America, Inc.

14.     At all pertinent times, a feasible alternative to the PRODUCTS has existed. Cornstarch is an organic carbohydrate that is quickly broken down by the body with no known health effects.  Cornstarch body powders have been sold and marketed for the same uses with nearly the same effectiveness. In fact, Johnson & Johnson has manufactured cornstarch versions of Johnson's Baby Powder for decades while continuing to sell the PRODUCTS.

15.     Historically, Johnson's Baby Powder has been a symbol of freshness, cleanliness, and purity.  During the time in question, the Johnson & Johnson Defendants advertised and

marketed this product as the beacon of "freshness" and "comfort," eliminating friction on the skin, absorbing "excess wetness," helping to keep skin feeling dry and comfortable, and "clinically proven gentle and mild."   The Johnson & Johnson Defendants compelled women through advertisements to dust themselves with this product to mask odor.  The bottle of "Johnson's Baby Powder" specifically targets women by stating, "For you, use every day to help feel soft, fresh, and comfortable."

16.    During the time in question, the Johnson & Johnson Defendants advertised and marketed the product "Shower to Shower" as safe for use by women as evidenced in its slogan, "A sprinkle a day keeps odor away," and through advertisement such as, "Your body perspires in more places than just under your arms.   Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day." And "SHOWER to SHOWER can be used all over your body."

17.    Although the labels on the bottles for the Johnson's Baby Powder and Shower to Shower products have changed over time, the core message has been the same:  that women can safely use the products on their bodies including their genital areas.

**Evidence Linking Talcum Powder to Ovarian Cancer**

18.    In a 1948 paper, Johnson & Johnson scientists recognized talc as a hazard to human health. Eberl et al., *Comparative Evaluation of the Effects of Talcum and a New Absorbable Substitute on Surgical Gloves*, 25 Am. J. Surgery 493 (1948).

19.    As early as 1961, research established that some particles, including particles like talc, can translocate from the exterior genital area to the ovaries in women. Egli & Newton, *The Transport of Carbon Particles in the Human Female Reproductive Tract*, 12 Fertility Sterility 2 (1961).

20.     In 1964, Johnson & Johnson admitted in an internal company document that talc could not be safely absorbed by the vagina while cornstarch could be.

21.     In 1971, the first study was conducted that suggested an association between talc and ovarian cancer.  This study was conducted by Dr. W.J. Henderson and others in Cardiff, Wales.

22.     Upon information and belief, since these early 1970's studies and the publications related to them, Defendants have been on notice of an association between talc exposure and ovarian cancer. Even before these studies specifically linking talcum powder to ovarian cancer, Defendants were aware of the human health hazards posed by talc.

23.     Johnson & Johnson was aware of the Henderson study and Tenovus data suggesting an association between talc and ovarian cancer. In an internal document, they themselves admit that this knowledge "puts them on notice" of the association. At or around this same time, Johnson & Johnson sent a donation to the Cardiff Scientific Society to obtain information concerning research being conducted by the Tenovus Institute, further proving they were on notice of the "talc and ovarian cancer problem."

24.     In internal documents, Johnson & Johnson acknowledged over the course of decades, its recognition of and notice of the talc/ovarian cancer issue and that "if the results of any scientific studies show any question of safety of talc" use, Johnson & Johnson would "not hesitate to take it off the market."

25.     In 1982, the first epidemiologic study was performed on talc powder use in the female genital area. This study was conducted by Dr. Daniel Cramer and others.  This study found a 92% increased risk in ovarian cancer with women who reported genital talc use.  Shortly after this study was published, Dr. Bruce Semple of Johnson & Johnson came and visited Dr. Cramer about his study.  Dr. Cramer advised Dr. Semple that Johnson & Johnson should place a warning

on its talcum powders about the ovarian cancer risks so that women can make an informed decision about their health.

26.     On August 12, 1982, Johnson & Johnson publicly recognized the studies linking the use of the PRODUCTS to ovarian cancer. In a New York Times article entitled "Talcum Company Calls Study on Cancer Link Inconclusive," the company admitted to being aware of the 1982 Cramer article that concluded women who apply talc daily to their genital areas were three times more likely to contract ovarian cancer.

27.     A Johnson & Johnson Technology Forecast, dated 1986, acknowledged that safety of cosmetic powders was a concern and that health professionals had decided that powders provide no health benefit.  The document also acknowledged that "Retrospective studies have implicated talc use in the vaginal area with the incidence of ovarian cancer."

28.     Upon information and belief, in or about 1990, the U.S. Food and Drug Administration ("FDA") asked manufacturers to voluntarily stop putting talc on surgical gloves because mounting scientific evidence showed that it caused adhesions in surgical patients, an indication of a foreign body reaction.  On December 19, 2016, the FDA issued a ban on powdered surgical gloves, stating that "the risk of illness or injury posted by powdered gloves is unreasonable and substantial."

29.     On November 10, 1994, the Cancer Prevention Coalition mailed a letter to then-CEO of Johnson & Johnson, Ralph Larson, informing his company that studies as far back as the 1960's ". . . show[] conclusively that the frequent use of talcum powder in the genital area poses a serious health risk of ovarian cancer." The letter cited a recent study by Dr. Bernard Harlow from Harvard Medical School confirming this fact and quoted a portion of the study where Dr. Harlow and his colleagues discouraged the use of talc in the female genital area.  The letter further stated

that 14,000 women a year die from ovarian cancer and that this type of cancer is very difficult to detect and has a low survival rate.  The letter concluded by requesting that Johnson & Johnson withdraw talc products from the market and  substitute safer alternative products made with cornstarch, or at a minimum, place warning information on its talc-based body powders about the ovarian cancer risk they pose.

30.     In 1996, the condom industry stopped dusting its condoms with talc due to the health concerns of ovarian cancer.

31.     On or about September 17, 1997, Johnson and Johnson's own toxicology consultant, Dr. Alfred Wehner, informed the company about false public statements being made by the Defendants regarding talc safety.

32.     In 2010, the International Association for the Research of Cancer (IARC), the specialized cancer agency of the World Health Organization, published a paper whereby it classified perineal use of talc based body powder (without asbestiform fibers) as a "Group 2B" human carcinogen as the result of an evaluation by a IARC Working Group in February 2006. IARC, which is universally accepted as the international authority on determining the carcinogenicity of chemical substances and cancer issues, concluded that studies from around the world consistently found an increased risk of ovarian cancer in women who used talcum powder in the perineal area.  IARC found that between 16-52% of women in the world were using talcum powder to dust their perineum and found an increased risk of ovarian cancer in women talcum powder users ranging from 30-60%.  Despite the IARC listing of talc without asbestiform fibers as a possible human carcinogen, documents show that industry, spearheaded by PCPC, continued to promote a national, state and local message about talc safety by recruiting scientists to publish articles that raised doubt about the link between perineal talc use and ovarian cancer.  In

approximately 2006, the Canadian government under The Hazardous Products Act and associated Controlled Products Regulations classified talc as a "D2A," "very toxic," "cancer causing" substance under its Workplace Hazardous Materials Information System (WHMIS).  Asbestos is also classified as "D2A."

33.     In 2006, Imerys Talc began placing a warning on its Material Safety Data Sheets (MSDS) it provided to the Johnson & Johnson Defendants regarding the talc it sold to them to be used in the PRODUCTS.  These MSDSs not only provided the warning information about the IARC classification but also included warning information regarding "States Rights to Know" and warning information about the Canadian Government's "D2A" classification of talc as well.

34.     In 2008, the Cancer Prevention Coalition submitted a "Petition Seeking a Cancer Warning on Cosmetic Talc Products" to the FDA.  The petition requested that the FDA immediately require cosmetic talcum powder products to bear labels with a prominent warning that frequent talc application in the female genital area is responsible for major risks of ovarian cancer.

35.     In 2012, Johnson & Johnson sold Shower to Shower to Valeant Pharmaceuticals n/k/a Bausch Health Co. Inc. In 2019, Bausch Health announced that it had reformulated Shower to Shower to replace the talc in the product with cornstarch.

36.     The Gilda Radner Familial Ovarian Cancer Registry, Roswell Park Center Institute, and the Department of Gynecologic Oncology University of Vermont publish a pamphlet entitled, "Myths & Facts about ovarian cancer: What you need to know." In this pamphlet, under "known" risk factors for ovarian cancer, it lists: "Use of Talc (Baby Powder) in the Genital Area."

37.     In 2016, Johnson & Johnson registered Baby Powder under the California Safe Cosmetics Act. This law was established to compel cosmetic manufacturers to register ingredients that are "known" or "suspected" carcinogens.

38.     Since the publication of the first epidemiologic study in 1982, there have been dozens of additional epidemiologic and other scientific studies providing data regarding the association of talc and ovarian cancer.  Nearly all of the epidemiology studies have reported an elevated risk for ovarian cancer associated with genital talc use in women and the scientific studies have provided biologically plausible explanations as to how genital talc use can cause ovarian cancer:

a.      In 1983, a case-control study found a 150% increased risk of ovarian cancer for women who use talcum powder in the genital area. Hartge, P., *et al.* Talc and Ovarian Cancer. *JAMA*. 1983; 250(14):1844.

b.      In 1988, a case control study of 188 women diagnosed with epithelial ovarian cancer and 539 control women found that 52% of the cancer patients habitually used talcum powder on the genital area before their cancer diagnosis. The study showed a 40% increase in risk of ovarian cancer in women that used talcum powder on their genital area and the relative risk for talc use between 1 and 9 years, relative to a shorter duration, was 1.6 (p = 0.05).  Whittemore AS, *et al.* Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. *Am. J. Epidemiol.* 1988 Dec; 128(6):1228-40.

c.      A 1989 study looked at 235 women diagnosed with epithelial ovarian cancer and 451 controls, and found a 29% increased risk in ovarian cancer with women

who reported genital talcum powder use more than once each week. Booth, M., *et al*. Risk factors for ovarian cancer: a case-control study. *Br J Cancer*. 1989 Oct; 60(4):592-8.

d.      In 1992, a case-control study found an 80% increased risk of ovarian cancer in women with more than 10,000 lifetime perineal applications of talc, demonstrating a positive dose-response relationship. Harlow BL, *et al.* Perineal exposure to talc and ovarian cancer risk. *Obstet Gynecol.* 1992 Jul; 80(1):19-26.

e.      Another 1992 case-control study reported a 70% increased risk from genital talc use and a 379% significantly increased risk of ovarian cancer in women who used talc on sanitary napkins in their genital area. Rosenblatt, K.A. *et al.* Mineral fiber exposure and the development of ovarian cancer. *Gynecol Oncol.* 1992 Apr; 45(1):20-5.

f.      Yet another 1992 case-control study by Yong Chen with 112 diagnosed epithelial ovarian cancer cases and 224 age-matched community controls found an elevated risk for ovarian cancer in women who applied talc-containing dusting powder to the lower abdomen and perineum for longer than 3 months.  Yong Chen, *et al.*, Risk Factors for Epithelial Ovarian Cancer in Beijing, China, 21 *Int. J. Epidemiol.*  23-29 (1992).

g.      In 1995, the largest study of its kind to date found a 27% increased risk in ovarian cancer for women who regularly use talc in the abdominal or perineal area. Purdie, D., *et al.* Reproductive and other factors and risk of epithelial ovarian cancer: An Australian case-control study. Survey of Women's Health Study Group. *Int J Cancer.* 1995 Sep 15; 62(6):678-84.

h.      In 1996, a case-control study found a statistically significant 97% increased risk of ovarian cancer in women who used what they described as a "moderate" or higher use of talc-based powders in their genital area. *See* Shushan, A., *et al.* Human menopausal gonadotropin and the risk of epithelial ovarian cancer. *Fertil. Steril.* 1996 Jan; 65(1):13-8.

i.      In 1997, a case control study of 313 women with ovarian cancer and 422 without this disease found that the women with cancer were more likely to have applied talcum powder to their external genitalia area. Women who performed any perineal dusting or used genital deodorant spray respectively had a statistically significant 60% to 90% higher risk of developing ovarian cancer. Cook, LS, *et al.* Perineal powder exposure and the risk of ovarian cancer. *Am. J Epidemiol.* 1997 Mar 1; 145(5):459-65.

j.      In 1997, a case-control study involving over 1,000 women found a statistically significant increased risk of 42% for ovarian cancer for women who applied talc directly or via sanitary napkins to their perineal area. Chang, S, *et al.* Perineal talc exposure and risk of ovarian carcinoma. *Cancer.* 1997 Jun 15; 79(12):2396-401.

k.      In 1998, a case-control study found a 149% increased risk of ovarian cancer in women who used talc-based powders on their perineal area. Godard, B., *et al.* Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study. *Am J Obstet Gynecol.* 1998 Aug; 179(2):403-10.

l.      Dr. Daniel Cramer conducted another case-control study in 1999, observing 563 women newly diagnosed with epithelial ovarian cancer and 523 women in a

control. The study found a statistically significant 60% increased risk of ovarian cancer in women that used talc-based body powders on their perineal area and an 80% increase in risk for women with over 10,000 lifetime applications. Cramer, DW, *et al.* Genital talc exposure and risk of ovarian cancer. *Int J Cancer.* 1999 May 5; 81(3):351-56.

m.      In 2000, a case-control study including over 2,000 women found a statistically significant 50% increased risk of ovarian cancer from genital talc use in women. Ness, RB, *et al.* Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. *Epidemiology.* 2000 Mar; 11(2):111-7.

n.      In 2004, a case-control study of nearly 1,400 women from 22 counties in Central California found a statistically significant 37% increased risk of epithelial ovarian cancer from women's genital talc use, and a 77% increased risk of serous invasive ovarian cancer from women's genital talc use. Importantly, this study also examined women's use of cornstarch powders as an alternative to talc, and found no increased risk of ovarian cancer in women in the cornstarch group, supporting a safe alternative to talc for genital use. Mills, PK, *et al.* Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. *Int J Cancer.* 2004 Nov 10; 112(3):458-64.

o.      In a 2007 study by Buz'Zard, *et al.*, talc was found to increase  cellular proliferation, induce neoplastic transformation and increase reactive oxygen species (ROS) generation time-dependently in the ovarian cells.  The study concluded that talc may contribute to ovarian carcinogenesis in humans.  The data suggested that talc may contribute to ovarian neoplastic transformation and

Pycnogenol reduced the talc-induced transformation. *Phytotherapy Research: PTR* 21, no. 6 (June 2007): 579–86.

p.      In 2008, a combined study of over 3,000 women from a New England-based case-control study found a 36% statistically significant increased risk for all types of epithelial ovarian cancer from genital talc use and a 60% increased risk of the serous invasive ovarian cancer subtype. The study also found a highly significant dose-response relationship between the cumulative talc exposure and incidence of ovarian cancer (and all serous invasive ovarian cancer), adding further support to the causal relationship. Gates, MA, *et al.* Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer. *Cancer Epidemiol Biomarkers Prev.* 2008 Sep; 17(9):2436-44.

q.      A 2009 case-control study of over 1,200 women found the risk of ovarian cancer increased significantly with increasing frequency and duration of talc use, with an overall statistically significant 53% increased risk of ovarian cancer from genital talc use. That increased risk rose dramatically, to 108%, in women with the longest duration and most frequent talc use. Wu, AH, *et al.* Markers of inflammation and risk of ovarian cancer in Los Angeles County. *Int. J Cancer.* 2009 Mar 15; 124(6):1409-15.

r.      In 2011, another case-control study of over 2,000 women found a 27% increased risk of ovarian cancer from genital talc use. Rosenblatt, KA, *et al.* Genital powder exposure and the risk of epithelial ovarian cancer. *Cancer Causes Control.* 2011 May; 22(5):737-42.

s.      In June of 2013, a pooled analysis of over 18,000 women in eight case-control studies found a 20% to 30% increased risk of women developing epithelial ovarian cancer from genital powder use. The study concluded by stating, "Because there are few modifiable risk factors for ovarian cancer, avoidance of genital powders may be a possible strategy to reduce ovarian cancer incidence." Terry, KL, *et al.* Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls. *Cancer Prev Res (Phila).* 2013 Aug; 6(8):811.

t.      In May 2015, Roberta Ness performed a meta-analysis of all accumulated epidemiologic evidence (23 case-control studies, 5 meta-analyses, and 3 analyses of a single cohort). Talc use was found to increase ovarian cancer by 30-60% in almost all well-designed studies. The results were published in the International Journal of Gynecological Cancer. Ness, R. Does talc exposure cause ovarian cancer? Intl. Jnl Gyn Cancer. 25 Suppl 1 (May 2015): 51.

u.      Also in 2015, Cramer, *et al*. performed a retrospective case-control study. Overall, genital talc use was associated with an OR (95% CI) of 1.33 (1.16, 1.52), with a trend for increasing risk by talc-years. In addition, subtypes of ovarian cancer more likely to be associated with talc included invasive serous and endometrioid tumors and borderline serous and mucinous tumors. Premenopausal women and postmenopausal HT users with these subtypes who had accumulated greater than 24 talc-years had ORs (95% CI) of 2.33 (1.32, 4.12) and 2.57 (1.51, 4.36), respectively. Epidemiology (Cambridge, Mass.), December 17, 2015.

v.      A 2016 study of African-American women found that body powder was significantly associated with Epithelial Ovarian Cancer. Genital powder was

associated with an increased risk of EOC (OR = 1.44; 95% CI, 1.11–1.86) and a dose–response relationship was found for duration of use and number of lifetime applications ($P < 0.05$).   The study concluded that body powder is a modifiable risk factor for epithelial ovarian cancer among African-American women. Schildkraut JM, et al. Association between Body Powder Use and Ovarian Cancer: the African American Cancer Epidemiology Study (AACES). Cancer epidemiology, biomarkers & prevention: a publication of the American Association for Cancer Research, cosponsored by the American Society of Preventive Oncology. *Cancer Epidemiol Biomarkers Prev; 25(10); 1411–7.* [1]

w.      A 2016 study examined 2,041 cases with epithelial ovarian cancer and 2,100 age- and-residence-matched controls.   Genital use of talc was associated with a 1.33 OR with a trend for increasing risk by years of talc use.   Most women in the study reported using Johnson & Johnson's Baby Powder and Shower to Shower.   Among epidemiologic variables, no confounders for the association were identified.   Cramer DW, et al. The association between talc use and ovarian cancer: a retrospective case-control study in two US states. *Epidemiology.* 2016; 27, 334-46.

x.      In 2018, two meta-analyses were published. These meta-analyses, which combined prior epidemiological studies, concluded that the use of talcum products increased the risk of ovarian cancer.

---

[1]      Johnson & Johnson was aware of the high rate of usage among African Americans (52%) and among Hispanics (37.6%). Ex. 12 (P-10 (JNJ000021093)).   Despite its knowledge of the increased risk of ovarian cancer, Johnson & Johnson targeted these populations in its marketing efforts. *Id.*

y.      In addition, over the past four decades, there have been numerous animal and human ovarian cell studies that show talc is harmful and can increase the risk of developing ovarian cancer.

z.      In 2018, Saed, et al. found that talc effects the redox state in human ovarian cells, a known biological pathway to cause cancer. The scientists concluded that this study demonstrated a cellular biological mechanism of how talc causes ovarian cancer.

aa.     In 2019, Taher et al. published a systematic review of the evidence linking talcum powder to ovarian cancer. This study concluded that "talc is a possible cause of human cancer in humans based on the totality of evidence from multiple observational studies and a plausible biological pathway including chronic inflammation and oxidative stress." Taher et al., *Critical Review of the Association between Perineal Use of Talc Powder and Risk of Ovarian Cancer*, 90 Reproductive Toxicology 88, 99 (2019).

### Constituents in Talcum Powder Products

39.     The PRODUCTS contain platy talc, fibrous talc, asbestos, including asbestos and asbestiform fibers (e.g., tremolite, chrysotile), heavy metals, and fragrance chemicals, which Plaintiff used and was exposed to, and that Defendants failed to warn the public, including Plaintiff, about the fact that the talcum powder products contained such carcinogenic substances.

40.     Defendants engaged in wrongful conduct and were negligent and created a dangerous and unreasonable risk of harm to others, including Plaintiff, by mining, milling, processing, supplying, distributing, designing, manufacturing, and selling the talcum powder

products which contained asbestos which Defendants knew or should have known was dangerous and posed a substantial risk of harm to others, including Plaintiff.

41.     Defendants—and their suppliers, experts, agents and advisors—have long known that the deposits in the earth that are associated with talc are also associated with the formation of asbestos. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800s, noted the presence of tremolite, anthophyllite and chrysotile commonly among those minerals found within talc deposits.

42.     Defendants have long employed and/or consulted with doctors, scientists, geologists, mineralogists and toxicologists, and that they have maintained extensive medical and scientific libraries and archives containing materials relating to the health hazards of talc and the presence of asbestos and asbestiform talc fibers in talc and talc deposits.

43.     Beginning in the 1930s, medical and scientific literature emerged indicating talc was commonly, if not invariably, contaminated with substances known or suspected of being carcinogenic, such as asbestos, silica, quartz, nickel and arsenic. Within the next several decades, a growing body of medical and scientific literature demonstrated that direct and secondary exposure to talc, including asbestos-containing talc, was hazardous to exposed persons' health in that it could cause lung disease, cancer and death.

44.     Defendants and their employees, agents and/or suppliers were members of the National Safety Council. In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study conducted among tremolite, talc and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45% talc and 45% tremolite.

45.     In 1968, a scientific study of store-bought, commercially available talcum powders conducted by the Occupational Health Program, National Center for Urban Industrial Health, was published and presented by the American Industrial Hygiene Association revealing that, contrary to popular belief, talcum powders were not entirely pure, but rather contained various fibrous minerals, including tremolite, anthophyllite, and chrysotile. This was not unexpected, as the study explains, because these types of fibers are often present in fibrous talc mineral deposits. Available documents indicate that during the same year and in the years following, at least one company began testing store-bought talcum powders for asbestos content. Despite tests showing some commercial talcum powders contained asbestos, there is no evidence that these positive results or the brand names of contaminated products were communicated to any governmental agency, the media or the public. The study concluded that "[a]ll of the 22 talcum products analyzed have a . . . fiber content . . .  averaging 19%. The fibrous material was predominantly talc but probably contained minor amounts of tremolite, anthophyllite, and chrysotile [asbestos-like fibers] as these are often present in fibrous talc mineral deposits . . . Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." L. J. Cralley et al., Fibrous and Mineral Content of Cosmetic Talcum PRODUCT, 29 AM. INDUSTRIAL HYGIENE ASSOC. J. 350-354 (1968). A 1976 follow-up study concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc . . . We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products."  Arthur Rohl, et al., Consumer talcums and powders: mineral and chemical characterization, 2 J TOXICOL ENVIRON HEALTH 255-284 (1976).

46.     A 1976 follow-up study conducted by researchers at Mount Sinai Hospital in New York concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc…We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." Rohl A.N., et al., Consumer Talcums and Powders: Mineral and Chemical Characterization, 2 J. TOXICOL. ENVIRON. HEALTH 255-284 (1976). The Mount Sinai study results were published by various newspapers, including the New York Times and the Washington Post.

47.     In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. Defendants and the PCPC, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products, such as Defendants' products.

48.     In 1971, the New York City of Environmental Protection Administration Air Resources Board conducted a study of two "leading" brands of talcum powder using transmission electron microscopy ("TEM") and X-ray diffraction analysis ("XRD"), and found them to contain 5-25% tremolite and anthophyllite asbestos fibers under 5 microns.

49.     Contemporaneously, evidence began to emerge from testing conducted by various regulatory agencies revealing that asbestos was being found in food, beer and drugs, including intravenously injected medicines. In 1972, and later in 1973, the FDA filed notices of proposed rulemaking requiring talc used in food, food packing and drugs to be asbestos-free. These were some of the same grades of talc used and supplied by Defendants.

50.      In 1973, the PCPC created a talc subcommittee and the Scientific Advisory

Committee in the District of Columbia to develop a testing methodology for detecting asbestos in

talc. Initially, the PCPC designated a group of its members to tests talc grades used in talcum

powder utilizing the methodology proposed by the FDA in its notice of rulemaking. Six samples

of talc used in commercially available talcum powders, plus one talc sample purposely spiked

with tremolite and chrysotile, were circulated among the members, including representatives of

Defendants. Of the eight participating members, four found asbestos in every sample, three did

not find asbestos in any sample (including the spiked sample), and one found asbestos only in the

spiked sample. In conclusion, all members agreed that the best and most reliable method of

detecting asbestos in talc is not optical microscopy, but rather TEM and electron diffraction. The

same members, however, dispensed with this analytical method, claiming TEM and electron

diffraction equipment was too expensive, despite Defendants then owning or having unfettered

access to same.

51.      From there, the difference between what Defendants and the PCPC knew

diverged from what they were representing to the FDA. Defendants, the PCPC and others in the

industry knew that there was no such thing as asbestos-free talc—only talc in which asbestos

could not be detected using the prevailing and most economical analytical methodology, XRD,

which at the time could not accurately identify chrysotile asbestos in talc, nor detect tremolite

asbestos contamination levels below 2-5%.

52.      Defendants and third parties collectively met with and corresponded with the

PCPC in the District of Columbia, as well as collectively met with the FDA, to individually and

collectively advocate for the use of "voluntary" XRD testing of miniscule portions of the tons of

talc to be used in consumer products. Defendants' "voluntary" method—that was developed

collectively by Defendants and the PCPC and advocated to the FDA in lieu of regulations requiring asbestos labeling or warnings on talcum powder products—was inadequate because levels of asbestos contamination in talc commonly fell below the detection limit of XRD. Defendants and the PCPC also knew that asbestos contamination was not uniformly distributed, such that the miniscule amounts tested would not reveal the true level of contamination in talc products, such as those to which Plaintiff was exposed.  In support of their voluntary XRD methodology, which was finally published in 1977, the PCPC produced letters to the FDA written by its members, including Defendants, identifying tests conducted showing talcum powder products did not contain asbestos. The PCPC, Defendants and other talc product producers, however, never informed the FDA of the hundreds of positive tests showing talc and talcum powders contained asbestos and other carcinogens.  Defendants and the PCPC made and published representations claiming that their testing method was adequate, that they were ensuring that talcum powder products were safe, and that the talc reaching consumers was "safe," despite having substantial knowledge and evidence to the contrary. Defendants intentionally and knowingly did so to avoid FDA regulations that may have required them to place warnings regarding the asbestos content of their products, and thereby inform the public, including Plaintiff, that talc-containing products contained asbestos.

53.     The PCPC and Defendants have represented to various news media outlets and the public at large that their products are "asbestos-free," when, in fact, their products did test positive for asbestos and those that did not were merely the result of inadequate and imprecise testing methods. "No asbestos detected" means something much different than "no asbestos," but due to Defendants' repeated conflation of the terms, the public has been led to erroneously believe talc products are safe.

54.     Between 1970 and the 1990s, tests conducted by and on behalf of Defendants and the talc industry continued to show that talc and talcum powder products contained asbestos as well as other constituents such as fibrous talc, cadmium, cobalt, chromium, copper, iron, manganese, and nickel. None of these positive tests were ever been produced or made known to any regulatory agency until late 2019, and only after knowledge of their existence became known in civil litigation.

55.     Since at least 1979, Defendants have conducted a campaign to convince the public that their products are regulated by the FDA, that their tests are conducted pursuant to FDA regulations, and that talcum powder products are therefore safe. Nothing could be further from the truth: the FDA has never been granted the regulatory authority by Congress to regulate cosmetics, including talcum powders. Defendants' concerns for the safety of their products have always been voluntary and under the auspices of the PCPC, a private industry group, that in its 40 years has only banned the use of 12 ingredients in all cosmetics ever sold in the United States.

56.     Defendants, collectively by their agreement and conspiracy, controlled industry standards regarding the testing, manufacture, sale, distribution and use of talcum powder products, and controlled the level of knowledge and information available to the public, including Plaintiff, regarding the hazards of exposure to carcinogens, including talc, asbestos, and fibrous talc. They also knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder products, including those to which Plaintiff was exposed.

57.     Defendants, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in said data and embarked upon a plan of deception

intended to deprive the public at large, including Plaintiff, of alarming medical and scientific findings, many of which remained in their exclusive possession and under their exclusive control.

58.     Defendants conspired and/or acted in concert with each other and/or with other entities through agreement and consciously parallel behavior: (a) to withhold from users of their products—and from persons who Defendants knew and should have known would be exposed thereto—information regarding the health risks of asbestos, talc, and other carcinogens contained in the PRODUCTS ; (b) to eliminate or prevent investigation into the health hazards of exposure to asbestos, talc and other carcinogens in the PRODUCTS; (c) to ensure that asbestos-containing talc and talcum powder products became widely used in commerce, irrespective of the potential and actual risk of harm to the users and consumers from the asbestos, talc and other carcinogens therein; and (d) to falsely represent that talc and talcum powder products, including those of Defendants, were safe for use by consumers.

59.     McCrone Associates, the laboratory selected by several talc producers—including Defendants—to analyze their products, was already using TEM for asbestos analysis. An article by McCrone and Stewart from 1974 describes the advantages of TEM for asbestos analysis and states that the TEM "only recently installed in our laboratory will undoubtedly be the ideal instrument for the detection and identification of very fine asbestos fibers."

60.     The PCPC "Method J4-1," published on October 7, 1976, states that TEM-SAED "offers greater sensitivity, but is not presented since it is unsuitable for normal quality control applications." The published J4-1 method did not rely on TEM, but  on XRD with "the level of detection of amphibole by this method [being] 0.5% and above." The PCPC met with and corresponded with Defendants and third parties, to individually and collectively advocate to the

FDA for the use of inadequate XRD testing on miniscule portions of the tons of talc obtained from the mining sources to be used in the consumer products, followed by tests by TEM when XRD was positive or suspicious. This voluntary method was developed by PCPC, Defendants, and was advocated to the FDA by the PCPC, and Defendants in lieu of regulations requiring labeling and warnings on talcum powder products, even though the PCPC and Defendants knew that the J4-1 method would not reveal the true level of asbestos in the talc that reached consumers. In fact, the first "round robin" tests, which analyzed a "PCPC Tremolite-Spiked Talc," resulted in 6 of 7 participating laboratories failing to detect the tremolite.

61.     In other words, 84% of the industry's laboratories failed to detect asbestos in a sample known to contain tremolite asbestos while using the PCPC's own J4-1 method. There is no evidence that the Defendants ever shared this remarkable failure with the FDA or the public.

62.     The FDA, and ultimately Plaintiff, directly and/or indirectly relied upon the PCPC's false representations regarding the safety of cosmetic talc. In fact, a FDA letter dated January 11, 1979, states "In cooperation with scientists from industry, our scientists have been making progress in the development of such regulatory methods." The continuing lack of FDA awareness regarding the PCPC's and Defendants' misrepresentations and concealment was obvious seven years later. In a response to a citizen petition to require an asbestos warning label on cosmetic talc, a July 11, 1986, the FDA states that an "analytical methodology was sufficiently developed" to ensure that "such talc [is] free of fibrous amphibole…" The PCPC's J4-1 method has continued for the past four decades to be the cosmetic talc industry's method for "ensuring" "asbestos-free" talc.

63.     In 1990, Kremer and Millette published a TEM method for analysis of asbestos in talc with a theoretical detection limit of about 0.00005%. Despite such improvements in

analytical techniques, the cosmetic talc industry continues, four decades later, to use and promote its antiquated and wholly inadequate J4-1 method.

64.     Since the 1976, numerous internal tests (or tests performed by contract labs or talc suppliers) indicated that the PRODUCTS contained asbestos, fibrous talc, and other carcinogenic minerals. Defendants did not share the results of these tests with the public and they only came to light  as a result of litigation.

65.     On November 14, 2018, Drs. William Longo and Mark Rigler published a report detailing results from tests  they performed on samples of the PRODUCTS provided by Johnson & Johnson dating from the 1960s to the early 2000s. Sixty-eight (68%) of the samples tested contained amphibole asbestos. The authors found that 98% of the samples contained fibrous talc..

66.     In 2019, the FDA contracted AMA Analytical Services, Inc. to test samples of talc-containing cosmetics, including Johnson's Baby Powder. AMA identified chrysotile asbestos and talc fibers in in sample D-58 of Johnson's Baby Powder.. As a result, Johnson & Johnson issued a recall of all bottles (approximately 33,000) from the sampled lot.

67.     The Defendants, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder, including talc and talcum powder used in the production of products to which Plaintiff used and was exposed.

68.     Defendants or their agents, suppressed, altered, changed, destroyed and/or revised reports, data, tests, studies and other documents regarding the potential presence of asbestos and other carcinogens in talc and talc-containing products, including Defendants' talcum powder

products to which Plaintiff was exposed. The conduct of Defendants, both acting individually and in concert with others was a substantial factor in causing harm to Plaintiff.

69.     Defendants engaged in wrongful conduct and were negligent and created a dangerous and unreasonable risk of harm to others, including Plaintiff, by mining, milling, processing, supplying, distributing, designing, manufacturing, and selling the talcum powder products which contained asbestos which Defendants knew or should have known was dangerous and posed a substantial risk of harm to others, including Plaintiff.

### Talc Task Force

70.     In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity.  Talc was found to be a carcinogen, with or without the presence of asbestos-like fibers.

71.     In response to the United States National Toxicology Program's study, the Cosmetic Toiletry and Fragrance Association (CTFA), now known as the PCPC, reconvened the Talc Interested Party Task Force (TIPTF). The TIPTF was originally formed by the CTFA in the 1980s to defend talc in response to the first epidemiologic studies that found an association between ovarian cancer and genital talc use. Johnson & Johnson, Johnson & Johnson Consumer Companies, Inc., and Luzenac—now known as Imerys Talc—were the primary actors and contributors to the TIPTF.  At all relevant times, Defendants, along with Imerys Talc, coordinated the activities of the TIPTF in the District of Columbia.

72.     The stated purpose of the TIPTF was to pool financial resources of these companies in an effort to collectively defend talc use at all costs and to prevent regulation of any type over this industry.  The TIPTF hired scientists to perform biased research regarding the safety of talc, members of the TIPTF edited scientific reports of the scientists hired by this group prior to the

submission of these scientific reports to governmental agencies, members of the TIPTF knowingly released false information about the safety of talc to the consuming public, and used political and economic influence on regulatory bodies regarding talc.  All of these activities have been well coordinated and planned by these companies and organizations, including the Johnson & Johnson Defendants and PCPC, along with Imerys Talc, over the past four (4) decades in an effort to prevent regulation of talc and to create confusion to the consuming public about the true hazards of talc relative to ovarian cancer.

73.     At all times relevant, PCPC coordinated the defense of talc and acted as a mouthpiece for the members of the TIPTF, including the Johnson & Johnson defendants and Imerys Talc, in the District of Columbia. PCPC, funded by cosmetic-industry companies, was motivated to defend talc because its members used talc in their products. Upon information and belief and at all times relevant, PCPC's revenue has been generated through a dues payment system based in part on its members' annual sales. As a result, PCPC had a direct pecuniary interest in defending the safety of the PRODUCTS.

### Cosmetic Ingredient Review

74.     In and around 1976, the Cosmetic Ingredient Review ("CIR") was formed by PCPC in the District of Columbia to give PCPC and the cosmetic industry more credibility for self-regulation.  Since that time, the Cosmetic Ingredient Review ("CIR") has reviewed the safety of ingredients used in the cosmetic and personal care products industry. Although Defendants have, at all relevant times, promoted CIR as an independent, regulatory body, CIR is an organization within and wholly funded by PCPC. In fact, CIR shares the same office space with PCPC in the District of Columbia and its employees are paid by PCPC.

75.     Over the years, CIR has reviewed thousands of ingredients used in the cosmetics industry, but has only found 12 ingredients to be "unsafe for use in cosmetics." In contrast, CIR has deemed approximately 1800 ingredients to be "safe as used." Over the course of these annual meetings, the panel is able to review about 500 ingredients per year.  On average, only about 20 minutes is spent discussing the safety of each ingredient.

76.     Even though PCPC knew of the safety concerns surrounding talc for more than three decades, the CIR did not begin to review talc until after the first lawsuit alleging a link between talc use and ovarian cancer was filed. Upon information and belief, during the CIR review process, Defendants influenced the scientists working on the review and ultimately edited the review in a biased manner.  Not surprisingly, when CIR published its final report in 2015, it found talc to be safe as used in cosmetics.

**Defendants' Failure to Warn of Risks**

77.     The Defendants had a duty to know and warn about the hazards associated with the use of the PRODUCTS.

78.     Despite the decades of mounting scientific and medical evidence supporting the association between genital talc use and ovarian cancer development, Defendants never placed a warning label or otherwise informed their users, including Plaintiff, that the use of the PRODUCTS in the genital area could lead to an increased risk of ovarian cancer,  instead defendants affixed a warning label to the bottle with a safety warning for children/others to avoid inhaling the PRODUCTS.

79.     The Defendants failed to inform its customers and end users of the PRODUCTS of a known catastrophic health hazard associated with the use of its products.

80. Other national manufacturers of talc based body powders have placed warnings on their products cautioning consumers to not use the product in the genital area because of ovarian cancer risk.

81. In addition, the Defendants procured and disseminated false, misleading, and biased information regarding the safety of the PRODUCTS to the public and used influence over governmental and regulatory bodies regarding talc.

82. Plaintiff reasonably and in good faith relied upon the false and fraudulent representations, omissions and concealments made by Defendants regarding the hazards of talc and talcum powder products, including the failure to warn and disclose the fact that such products contained asbestos and other carcinogens, including talc itself, and was, therefore, deprived of an opportunity to make informed decisions concerning use of, exposure to and contact with said products.

83. As a direct and proximate result of the Defendants' calculated and reprehensible conduct, the Plaintiff developed ovarian cancer, which required surgeries and treatments, and was otherwise injured in a personal and pecuniary nature.

**PLAINTIFF'S USE OF THE PRODUCTS AND DIAGNOSIS OF CANCER**

84. The Plaintiff, Antoinette Tarczy, used the PRODUCTS to dust her perineum for feminine hygiene purposes from approximately January 1971 to February 2004, with such action taking place in Michigan. This was an intended and foreseeable use of the PRODUCTS based on the advertising, marketing, and labeling of the PRODUCTS.

85. In January 1971, Plaintiff was living in Michigan when she first used the PRODUCTS, and she used the PRODUCTS continuously thereafter until February 2004.

86.     In or about October 1, 2003, Plaintiff was diagnosed with ovarian cancer while living in Michigan. At the time of diagnosis, Plaintiff was fifty-three.

## FEDERAL STANDARDS AND REQUIREMENTS

87.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

88.     At all relevant times, Defendants had the obligation to comply with federal standards and regulations in the manufacture, design, marketing, branding, labeling, distribution, and sale of the PRODUCTS.

89.     Defendants, each individually, *in solido*, and/or jointly, violated the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §301, *et seq.*

90.     Defendants have or may have failed to comply with federal standards and requirements governing the manufacture, design, marketing, branding, and sale of the PRODUCTS including, but not limited to, the following violations of sections and subsections of the United States Code and the Code of Federal Regulations:

a.      The PRODUCTS are adulterated pursuant in violation of 21 U.S.C. § 361 because, among other things, they contain a poisonous or deleterious substance which may render them injurious to users under the conditions of use prescribed in the labeling thereof, or under such conditions of use as are customary or usual.

b.      The PRODUCTS are misbranded in violation of 21 U.S.C. § 362 because, among other things, their labeling is false or misleading.

c.      The PRODUCTS are misbranded in violation 21 U.S.C. § 362 because words, statements, or other information required by or under authority of 21 U.S.C. § 362 are not prominently placed thereon with such conspicuousness and in such

31

terms as to render them likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

d.     The PRODUCTS are misbranded in violation of 21 C.F.R. § 701.1 because they contain false or misleading representations that they are safe for daily application to all parts of the female body.

e.     The PRODUCTS do not bear a warning statement, in violation of 21 C.F.R. § 740.1, to prevent a health hazard that may be associated with the PRODUCTS, namely that the PRODUCTS may cause ovarian cancer or a heightened risk of ovarian cancer when applied to the perineal area.

f.     The PRODUCTS do not prominently and conspicuously bear a warning statement, in violation of 21 C.F.R. § 740.2, as to the risk of ovarian cancer caused by the use of the PRODUCTS when applied to the perineal area, in such terms and design that it is likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

g.     The PRODUCTS, in violation of 21 C.F.R. § 740.10, do not conspicuously state on their principal display panel that the safety of the PRODUCTS have not been determined and/or that the safety of the PRODUCTS' principal ingredients have not been determined.

## COUNT I – VIOLATION OF THE D.C. CONSUMER PROTECTION PROCEDURES ACT, D.C. CODE § 28-3901 ET SEQ.
### (Against the Johnson & Johnson Defendants)

91.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

92.     Plaintiff is a "consumer" as defined in D.C. Code § 28-3901(2), in that Plaintiff purchased or received, other than for purposes of resale, goods from the Johnson & Johnson Defendants.

93.     The Johnson & Johnson Defendants are "merchants" as defined in D.C. Code § 28-3901(3), in that they sold, either directly or indirectly, consumer goods to Plaintiff in the ordinary course of business.

94.     The Johnson & Johnson Defendants' actions in marketing, advertising, and otherwise making public representations about the PRODUCTS constitute "trade practices" as defined by D.C. Code § 28-3901(6), as they were actions that created, altered, repaired, furnished, made available, provided information about, or, directly or indirectly, solicited or offered for or effectuated a sale, lease, or transfer of consumer goods.

95.     At all relevant times, the Johnson & Johnson Defendants knew or should have known of the unreasonably dangerous and carcinogenic nature of talc, especially when used in a woman's perineal region.

96.     At all relevant times, the Johnson & Johnson Defendants, through their labeling and marketing of the PRODUCTS, intentionally misrepresented material facts in order to mislead consumers that the PRODUCTS were safe for use in the female perineal area and induce consumers to purchase its PRODUCTS. The Johnson & Johnson Defendants, through their labeling, advertisements, and public representations associated with the PRODUCTS, since the PRODUCTS' introduction into the marketplace, have stated that the PRODUCTS were safe for use all over the body, including the female perineal area.  The Johnson & Johnson Defendants' misrepresentations constitute unlawful trade practices under D.C. Code §§ 28-3904(a), (d), and (e).

97.     The labeling and advertisements for the PRODUCTS include, but are not limited to, the following statements: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms;" "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day;" and "SHOWER to SHOWER can be used all over your body."

98.     In particular, the Johnson & Johnson Defendants advertised the product SHOWER to SHOWER to be applied "all over," and suggested that women use it to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort."

99.     At all relevant times, the Johnson & Johnson Defendants misled consumers by failing to state material facts about the PRODUCTS.  In particular, the Johnson & Johnson Defendants failed to disclose to the public that the PRODUCTS were unsafe and posed serious health hazards, particularly when used in the perineal areas of women. The first study that suggested an association between talc and ovarian cancer was conducted in 1971, and studies confirming this association have been and continue to be conducted. The Johnson & Johnson Defendants were aware of the hazardous risks posed by the PRODUCTS and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them. The Johnson & Johnson Defendants' failure to state material facts about their PRODUCTS constitutes a violation of D.C. Code §28-3904(f) in that the failure to state material facts misled consumers, including the Plaintiff.

100.    At all relevant times, Plaintiff was deceived by Defendants' intentional misrepresentations and omissions, including by the orchestrated claims made on or in television

commercials, advertising materials, Web sites, and on product labels and packaging regarding the usage and safety of the PRODUCTS.

101.    At all relevant times, Plaintiff acted in reasonable reliance upon the Johnson & Johnson Defendants' unlawful trade practices, and had the Johnson & Johnson Defendants not engaged in the deceptive conduct described herein, Plaintiff would not have purchased and/or received the PRODUCTS.

102.    As a direct and proximate result of the unlawful trade practices of the Johnson & Johnson Defendants, in violation of D.C. Code §28-3901, *et seq.*, Plaintiff has suffered and will continue to suffer damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT II – NEGLIGENCE OR WANTONNESS
### (Against the Johnson & Johnson Defendants)

103.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

104.    At all relevant times, the Johnson & Johnson Defendants manufactured, designed, formulated, marketed, tested, promoted, supplied, sold and/or distributed the PRODUCTS in the regular course of business.

105.    At all relevant times, the Johnson & Johnson Defendants had a duty to act with reasonable care in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution, and sale of the PRODUCTS.

106.    At all relevant times, the Johnson & Johnson Defendants had a duty to act with reasonable care and to warn Plaintiff of the risk, dangers, and adverse side effects of the PRODUCTS.

107.    At all relevant times, the Johnson & Johnson Defendants knew or should have known that the PRODUCTS were unreasonably dangerous and defective when used in a reasonably foreseeable manner.

108.    The Johnson & Johnson Defendants breached their duty to Plaintiff and were otherwise negligent in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution, and/or sale of the PRODUCTS utilized by Plaintiff, which were inherently dangerous and defective, and unfit and unsafe for their intended and reasonably foreseeable uses.

109.    The Johnson & Johnson Defendants were further negligent in failing to accompany the PRODUCTS with proper warnings or adequate labeling regarding the dangerous and potentially fatal health risks associated with the use of the PRODUCTS, particularly when used in the perineal area of women, which was their intended or reasonable foreseeable use.

110.    As a direct and proximate result of the Johnson & Johnson Defendants' negligence, Plaintiff has suffered and will continue to suffer damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants in a fair and reasonable sum in excess of $75,000, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT III – NEGLIGENCE OR WANTONNESS
### (Against PCPC)

111.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

112.    At all relevant times, PCPC was a national trade association representing the personal care and cosmetics industry of which Johnson & Johnson and Imerys Talc were active members.

113.    At all relevant times, PCPC had actual knowledge of the significant risk of ovarian cancer caused by application of the PRODUCTS to the female perineal area.

114.    At all relevant times, PCPC voluntarily undertook a duty of care to Plaintiff by promulgating standards, norms, and/or bylaws that govern, control, and/or inform the manufacturing, design, labeling, marketing, distribution, and/or branding practices of its member companies, including but not limited to the Johnson & Johnson Defendants and Imerys Talc.

115.    At all relevant times, PCPC had the means and authority to control the safety standards of the Johnson & Johnson Defendants and Imerys Talc in manufacturing, design, labeling, marketing, distribution, and/or branding the PRODUCTS.

116.    PCPC breached its duty of care to Plaintiff by negligently failing to ensure that the Johnson & Johnson Defendants and Imerys Talc complied and adhered to the PCPC standards, norms, and/or bylaws concerning the safe manufacture, design, labeling, marketing, distribution, and/or branding of the PRODUCTS, and subsequently allowing the PRODUCTS to be introduced into the stream of interstate commerce despite their significant health and safety risks of which PCPC had full knowledge.

117.    As a direct and proximate result of PCPC's negligence, the Johnson & Johnson Defendants and Imerys Talc manufactured, designed, labeled, marketed, distributed, and branded

its PRODUCTS in a way that foreseeably caused a significant risk of ovarian cancer when the PRODUCTS were applied to the female perineal area.

118.    As a further direct and proximate result of PCPC's negligence, Plaintiff suffered and will continue to suffer damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against PCPC in a fair and reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT IV – STRICT LIABILITY – DEFECTIVE MANUFACTURE AND DESIGN
### (Against the Johnson & Johnson Defendants)

119.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

120.    The Johnson & Johnson Defendants are liable under the theory of strict liability as set forth in the Restatement (Second) of Torts § 402A.

121.    At all relevant times, the Johnson & Johnson Defendants were engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing the PRODUCTS into the stream of interstate commerce, which they sold and distributed throughout the United States.

122.    At all relevant times, the PRODUCTS were expected to and did reach Plaintiff without a substantial change in condition.

123.    At all relevant times, the PRODUCTS were defectively and improperly manufactured and designed by the Johnson & Johnson Defendants in that, when the PRODUCTS

left the hands of the Johnson & Johnson Defendants, the foreseeable risks of the PRODUCTS far outweighed the benefits associated with their design and formulation.

124.    At all relevant times, the PRODUCTS were defectively manufactured and designed by the Johnson & Johnson Defendants in that their design and formulation is more dangerous than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

125.    At all relevant times, the PRODUCTS created significant risks to the health and safety of consumers that far outweigh the risks posed by other products on the market used for the same therapeutic purpose.

126.    At all relevant times, a reasonable and safer alternative design existed, which could have feasibly been employed by the Johnson & Johnson Defendants to manufacture a product with the same therapeutic purpose as the PRODUCTS.  Despite knowledge of this reasonable and safer alternative design, the Johnson & Johnson Defendants failed to alter the PRODUCTS' design and formulation.  The magnitude of the danger created by the PRODUCTS far outweighs the costs associated with using an alternative, safer design.

127.    As a direct and proximate result of the defective design and manufacture of the PRODUCTS, Plaintiff has suffered and will continue to suffer damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT V – STRICT LIABILITY – FAILURE TO WARN
### (Against the Johnson & Johnson Defendants)

128.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

129.    The Johnson & Johnson Defendants are liable under a theory of strict products liability as set forth in § 402A of the Restatement of Torts (Second).

130.    At all relevant times, the Johnson & Johnson Defendants were engaged in the business of manufacturing, formulating, designing, marketing, testing, promoting, selling, distributing, and otherwise introducing into the stream of interstate commerce the PRODUCTS.

131.    At all relevant times, the Johnson & Johnson Defendants knew or should have known that the use of the PRODUCTS in the female perineal area significantly increased the risk of ovarian cancer in women based upon scientific knowledge dating back until at least 1971.

132.    At all relevant times, the PRODUCTS, manufactured and supplied by the Johnson & Johnson Defendants, were defective and unreasonably dangerous because, despite the Johnson & Johnson Defendants' knowledge that its PRODUCTS were carcinogenic and could lead to an increased risk of ovarian cancer when applied to the female perineal area, a reasonably foreseeable use of the PRODUCTS, the Johnson & Johnson Defendants failed to provide adequate warning or instruction to consumers, including Plaintiff, regarding the increased risk of ovarian cancer when the PRODUCTS are applied to the female perineal area.

133.    At all relevant times, Plaintiff used the PRODUCTS to powder her perineal area, a use that was reasonably foreseeable and for which the PRODUCTS were supplied.

134.    Had Plaintiff received warning and/or instruction from the Johnson & Johnson Defendants regarding the increased risk of ovarian cancer associated with the PRODUCTS when applied to the perineal area, Plaintiff would not have used the PRODUCTS in this manner.

135.    Due to the absence of any warning or instruction by the Johnson & Johnson Defendants as to the significant health and safety risks posed by the PRODUCTS as described herein, Plaintiff was unaware that the PRODUCTS created an increased risk of ovarian cancer, as this danger was not known to the general public.

136.    As the direct and proximate result of the reasonably foreseeable use of the PRODUCTS as manufactured, formulated, marketed, tested, promoted, sold, distributed, and introduced into the stream of commerce by the Johnson & Johnson Defendants, Plaintiff suffered and will continue to suffer damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT VI – NEGLIGENT MISREPRESENTATION
### (Against the Johnson & Johnson Defendants)

137.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

138.    At all relevant times, the Johnson & Johnson Defendants were engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling and/or distributing the PRODUCTS.

139.    At all relevant times, the Johnson & Johnson Defendants had a duty to disclose to consumers and the public material facts about the PRODUCTS, including the material fact that application of the PRODUCTS to the female perineal area causes a significantly increased risk of ovarian cancer.

140.    Through their actions and omissions in advertising, promoting, labeling, and otherwise, Defendants made public misrepresentations of material facts to, and/or concealed material facts from, consumers like Plaintiff concerning the character, safety, and effectiveness of the PRODUCTS.

141.    At all relevant times, those misrepresentations and omissions included, but are not limited to, the following:

 a.    The Johnson & Johnson Defendants labeled and advertised the PRODUCTS in the following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms;" "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day; and "SHOWER to SHOWER can be used all over your body."

 b.    The Johnson & Johnson Defendants advertised the product SHOWER to SHOWER to be applied "all over," and in particular, urged women to use it to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction.  Apply after a bikini wax to help reduce irritation and discomfort."

 c.    The Johnson & Johnson Defendants, through the advertisements described above, among others, misrepresented to consumers, including the Plaintiff, that the PRODUCTS were safe for use all over the body, including the female perineal area.

 d.    Despite actual knowledge of the health risks of the PRODUCTS, the Johnson & Johnson Defendants failed to disclose to the consumers and the Plaintiff, through adequate warnings, representations, labeling, or otherwise, that the

42

PRODUCTS were inherently dangerous and carcinogenic in nature, which poses serious health risks to consumers.

e.      Despite actual knowledge that the use of the PRODUCTS in the perineal area created a significantly increased risk of ovarian cancer, the Johnson & Johnson Defendants failed to disclose to consumers and the Plaintiff, through adequate warnings, representations, labeling, or otherwise, that material fact.

142.    At all relevant times, the Johnson & Johnson Defendants failed to exercise reasonable care in ascertaining or sharing information regarding the safe use of PRODUCTS, failed to disclose facts indicating that the PRODUCTS were inherently dangerous and carcinogenic in nature, and otherwise failed to exercise reasonable care in communicating the information concerning the PRODUCTS to Plaintiff and/or concealed relevant facts that were known to them.

143.    At all relevant times, Plaintiff was not aware of the falsity of the foregoing misrepresentations, nor was she aware that material facts concerning talc and the PRODUCTS had been concealed or omitted.  In reasonable reliance upon the Johnson & Johnson Defendants' misrepresentations and/or omissions, Plaintiff was induced to and did purchase the PRODUCTS and did use the PRODUCTS on her perineal area.  If the Johnson & Johnson Defendants had disclosed true and accurate material facts concerning the risks of the use of the PRODUCTS, in particular the risk of developing ovarian cancer from using the PRODUCTS in the female perineal area, Plaintiff would not have purchased and/or received the PRODUCTS and/or used the PRODUCTS in that manner.

144.    Plaintiff's reliance upon the Johnson & Johnson Defendants' misrepresentations and omissions was justified and reasonable because, among other reasons, those

misrepresentations and omissions were made by individuals and entities who were in a position to know the material facts concerning the PRODUCTS and the association between the PRODUCTS and the incidence of ovarian cancer, while Plaintiff was not in a position to know these material facts, and because the Johnson & Johnson Defendants failed to warn or otherwise provide notice to the consuming public as to the risks of the PRODUCTS, thereby inducing Plaintiff to use the PRODUCTS in lieu of safer alternatives and in ways that created unreasonably dangerous risks to her health. At all relevant times, the Johnson & Johnson Defendants' corporate officers, directors, and/or managing agents knew of and ratified the acts of the Johnson & Johnson Defendants, as alleged herein.

145.   As a direct and proximate result of the Johnson & Johnson Defendants' negligent misrepresentations and/or omissions concerning the risks and benefits of the PRODUCTS, Plaintiff suffered and continues to suffer from the injuries and damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate

### COUNT VII – FRAUD
**(Against the Johnson & Johnson Defendants)**

146.   Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

147.   At all relevant times, the Johnson & Johnson Defendants intentionally, willfully, and/or recklessly, with the intent to deceive, misrepresented and/or concealed material facts to consumers and users, including Plaintiff.

44

148.    At all relevant times, the Johnson & Johnson Defendants misrepresented and/or concealed material facts concerning the PRODUCTS to consumers, including the Plaintiff, with knowledge of the falsity of their misrepresentations.

149.    At all relevant times, upon information and belief, the misrepresentations and concealments concerning the PRODUCTS made by the Johnson & Johnson Defendants include, but are not limited to the following:

      a.    The Johnson & Johnson Defendants falsely labeled and advertised the PRODUCTS in the following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable," "a sprinkle a day keeps the odor away," "your body perspires in more places than just under your arms," "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day," and "SHOWER to SHOWER can be used all over your body."

      b.    The Johnson & Johnson Defendants falsely advertised the PRODUCT SHOWER to SHOWER to be applied "all over," and in particular, urges women to use it to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort."

      c.    The Johnson & Johnson Defendants, through the advertisements described above, knowingly misrepresented to Plaintiff and the public that the PRODUCTS were safe for use all over the body, including the perineal areas of women.

      d.    The Johnson & Johnson Defendants intentionally failed to disclose that talc and the associated PRODUCTS, when used in the perineal area, increase the risk of ovarian cancer.

e.      The Johnson & Johnson Defendants intentionally failed to disclose and actively concealed that talcum powder products contained other carcinogenic constituents such as fibrous talc, asbestos, heavy metals, and fragrance chemicals.

f.      The Johnson & Johnson Defendants intentionally failed to include adequate warnings with the PRODUCTS regarding the potential and actual risks of using the PRODUCTS in the perineal area on women and the nature, scope, severity, and duration of any serious injuries resulting therefrom.

g.      Despite knowing about the carcinogenic nature of talc and its likelihood to increase the risk of ovarian cancer in women, the Johnson & Johnson Defendants falsely marketed, advertised, labeled and sold the PRODUCTS as safe for public consumption and usage, including for use by women to powder their perineal areas.

150.    At all relevant times, the Johnson & Johnson Defendants actively, knowingly, and intentionally concealed and misrepresented these material facts to the consuming public with the intent to deceive the public and Plaintiff, and with the intent that the consumers would purchase and use the PRODUCTS in the female perineal area.

151.    At all relevant times, the consuming public, including Plaintiff, would not otherwise have purchased the PRODUCTS and/or applied the PRODUCTS in the perineal area if they had been informed of the risks associated with the use of the PRODUCTS in the perineal area.

152.    At all relevant times, Plaintiff relied on the Johnson & Johnson Defendants' misrepresentations concerning the safety of the PRODUCTS when purchasing the PRODUCTS and using them in her perineal area, and her reliance was reasonable and justified.

153.     As a direct and proximate result of the Johnson & Johnson Defendant's fraudulent conduct concerning the PRODUCTS, as described herein, Plaintiff suffered and continues to suffer from the injuries and damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT VIII – FRAUD
### (Against PCPC)

154.     Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

155.     At all relevant times, PCPC intentionally, willfully, and/or recklessly, with the intent to deceive, misrepresented and/or concealed material facts to consumers and users of the PRODUCTS, including Plaintiff.

156.     At all relevant times, PCPC fraudulently misrepresented and/or concealed material facts to consumers and users of the PRODUCTS, including Plaintiff, with knowledge of the falsity of their misrepresentations.

157.     At all relevant times, upon information and belief, PCPC's conduct giving rise to fraud includes, but is not limited, to the following:

a.     PCPC formed the TIPTF, with the purpose to pool financial resources in an effort to prevent regulation of talc products, including the PRODUCTS.

b.     PCPC, through the TIPTF, hired and funded scientists to perform research regarding the safety of talc.  The TIPTF then edited the scientific reports in an effort to skew the data so that it demonstrated safety of talc and talc products and suppress

47

data demonstrating the dangers of talc.  The TIPTF then released and disseminated this biased and intentionally misleading data to governmental agencies.

c.       PCPC, through the TIPTF, knowingly released false information about the safety of talc products to the consuming public with the intent to induce consumers, including the Plaintiff, to purchase talc products.

d.       PCPC extensively lobbied and used political and economic influence on governmental bodies in order to prevent regulation of talc products, including the PRODUCTS.   These efforts were based knowingly on false and misleading information about the safety of talc.

e.       PCPC caused to be released, published, and disseminated medical and scientific data, literature, and reports containing information and statements regarding the risks of ovarian cancer which PCPC knew were incorrect, incomplete, and misleading.

158.    At all relevant times, PCPC actively, knowingly, and intentionally concealed and misrepresented these material facts to consumers, including the Plaintiff, with the intent to deceive the public and Plaintiff, and with the intent that consumers would purchase and use the product in the female perineal area.

159.    The consuming public, including Plaintiff, would not have purchased the PRODUCTS and/or applied the PRODUCTS in the perineal area if they had been informed of the risks associated with the use of the PRODUCTS in that manner.

160.    At all relevant times, Plaintiff relied on PCPC's misrepresentations concerning the safety of the PRODUCTS and fraudulent conduct when purchasing the PRODUCTS and using them in her perineal area, and her reliance was reasonable and justified.

161.     As a direct and proximate result of PCPC's fraudulent conduct concerning the PRODUCTS, as described herein, Plaintiff suffered and continues to suffer from the injuries and damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against PCPC in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT IX – BREACH OF EXPRESS WARRANTIES
### (Against the Johnson & Johnson Defendants)

162.     Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

163.     The Johnson & Johnson Defendants, through their advertising and promotional materials, expressly warranted and affirmed that the PRODUCTS were safe for the uses for which they were intended and for uses which were reasonably foreseeable. The Johnson & Johnson Defendants' express warranties extended beyond delivery of the PRODUCTS and expressly warranted for future performance of the PRODUCTS. These express warranties include, but are not limited to, the following:

a.     The Johnson & Johnson Defendants advertised and labeled the PRODUCTS as safe for application all over the body, including the following: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms;" "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day;" and "SHOWER to SHOWER can be used all over your body."

b.      The Johnson & Johnson Defendants advertised the PRODUCT SHOWER to SHOWER to be applied around or on the perineal area.  For example, the Johnson & Johnson Defendants advertised that women should use their SHOWER to SHOWER PRODUCT to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort."

c.      The Johnson & Johnson Defendants, through the advertisements as listed above, made express warranties to Plaintiff and the public that the PRODUCTS were safe and effective when applied all over the body, including the female perineal area.

164.    At all relevant times, the Johnson & Johnson Defendants breached said express warranties in that the PRODUCTS were unsafe and ineffective for application all over the body, specifically when used in the female perineal area, because the PRODUCTS when used in this manner for which the Johnson & Johnson Defendants advertised and promoted significantly increased the risk of developing ovarian cancer among consumers.

165.    At all relevant times, the Johnson & Johnson Defendants had knowledge of the hazards and health risks posed by the PRODUCTS when applied to the perineal area.

166.    At all relevant times, the Johnson & Johnson Defendants willfully failed to disclose the defects and health risks of the PRODUCTS to Plaintiff and the consuming public.

167.    At all relevant times, in reliance upon the express warranties made by the Johnson & Johnson Defendants as set forth above, Plaintiff purchased and used the PRODUCTS in her perineal area, believing that the PRODUCTS were safe when used in this manner

168.     As a direct and proximate result the Johnson & Johnson Defendant's express warranties concerning the PRODUCTS, as described herein, Plaintiff suffered and continues to suffer from the injuries and damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT X – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Against The Johnson & Johnson Defendants)

169.     Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

170.     At the time the Johnson & Johnson Defendants manufactured, marketed, labeled, promoted, distributed and/or sold the PRODUCTS, Defendants knew of the uses for which the PRODUCTS were intended, including use by women in the perineal area, and impliedly warranted the PRODUCTS were merchantable and fit for the ordinary purposes for which they were intended.

171.     Members of the consuming public, including consumers such as Plaintiff, were intended third-party beneficiaries of the warranty.

172.     The PRODUCTS were not merchantable or fit for their ordinary purposes, because they had a propensity to lead to the serious personal injuries described herein.

173.     Plaintiff reasonably relied on the Johnson & Johnson Defendants' representations that the PRODUCTS were safe and free of defects.

174.     The Johnson & Johnson Defendants' breach of the implied warranty of merchantability was the direct and proximate cause of Plaintiffs' injuries.

175.     The Johnson & Johnson Defendants' conduct, as described above, was extreme and outrageous.  Defendants risked the lives of the consumers and users of their products, including Plaintiff, with knowledge of the safety and efficacy problems, and suppressed this knowledge from Plaintiff and the general public.  The Johnson & Johnson Defendants made conscious decisions not to redesign, relabel, warn or inform Plaintiff or the unsuspecting consuming public.  The Johnson & Johnson Defendants' outrageous conduct warrants an award of punitive damages.

176.     As a direct and proximate result of the Johnson & Johnson Defendants' implied warranties of merchantability concerning the PRODUCTS, as described herein, Plaintiff suffered and continue to suffer from the injuries and damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT XI– BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE (Against The Johnson & Johnson Defendants)

177.     Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

178.     The Johnson & Johnson Defendants manufactured, supplied and sold the PRODUCTS with an implied warranty that they were fit for the particular purpose for which they were warranted.

179.     Members of the consuming public, including Plaintiff, were the intended third-party beneficiary of the warranty.

180.    The PRODUCTS were not fit for the particular purpose for which they were warranted without serious risk of personal injury, which risk is much higher than other products designed to perform the same function.

181.    Plaintiff reasonably relied on the Johnson & Johnson Defendants' representations that the PRODUCTS were safe and effective for use by women in the perineal area.

182.    The Johnson & Johnson Defendants' breach of the implied warranty of fitness for a particular purpose was the direct and proximate cause of Plaintiff's injuries.

183.    The Johnson & Johnson Defendants' conduct, as described above, was extreme and outrageous. The Johnson & Johnson Defendants risked the lives of the consumers and users of their products, including Plaintiff, by having knowledge of the safety and efficacy problems associated with the PRODUCTS, but suppressing this knowledge from the general public.  The Johnson & Johnson Defendants made conscious decisions not to redesign, relabel, warn or inform the unsuspecting consuming public.  The Johnson & Johnson Defendants' outrageous conduct warrants an award of punitive damages.

184.    As a direct and proximate result of the Johnson & Johnson Defendants' implied warranties of fitness concerning the PRODUCTS, as described herein, Plaintiff suffered and continue to suffer from the injuries and damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT XII – CIVIL CONSPIRACY
### (Against All Defendants)

185.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

186.    At all relevant times, the Defendants and/or their predecessors-in-interest knowingly agreed, contrived, combined, confederated, and/or conspired to cause Plaintiff's injuries by exposing the Plaintiff to harmful and dangerous PRODUCTS.

187.    Further, at all relevant times, the Defendants knowingly agreed, contrived, confederated, and/or conspired to defraud Plaintiff and consumers of the PRODUCTS regarding the true nature of the PRODUCTS and their potential to cause ovarian cancer when used in a reasonably foreseeable manner.

188.    At all relevant times, the Defendants knowingly agreed, contrived, confederated, and/or conspired to defraud Plaintiff and consumers of the PRODUCTS with the purpose of maintaining the popularity and reputation of the PRODUCTS and therefore maintaining high PRODUCT sales, at the expense of consumer safety.

189.    At all relevant times, pursuant to and in furtherance of said conspiracies, the Defendants performed the following overt and unlawful acts:

a.      For many decades, upon information and belief, Defendants, individually, jointly, and in conspiracy with each other, have been in possession of medical and scientific data, literature, and test reports, which indicate that, when applied to the perineal area, an ordinary and foreseeable use by women, the PRODUCTS are unreasonably dangerous, hazardous, deleterious to human health, carcinogenic, and potentially deadly;

b.      Upon information and belief, despite the medical and scientific data, literature, and test reports possessed by and available to the Defendants, Defendants individually, jointly, and in conspiracy with each other, fraudulently, willfully, and maliciously:

    i.      Withheld, concealed, and suppressed said medical information regarding the increased risk of ovarian cancer and the actual constituents in the PRODUCTS from consumers, including Plaintiff;

    ii.     The Defendants, through the TIPTF, instituted a "defense strategy" to defend talc at all costs. Admittedly, the Defendants, through the TIPTF, used their influence over the NTP Subcommittee, and the threat of litigation against the NTP to prevent the NTP from classifying talc as a carcinogen on its 10th RoC;

    iii.    Caused to be released, published, and disseminated medical and scientific data, literature, and test reports containing information and statements regarding the risks of ovarian cancer, which Defendants knew were incorrect, incomplete, and misleading.

c.      Upon information and belief, by these false and fraudulent representations, omissions, and concealments, Defendants intended to induce consumers, including the Plaintiff, to rely upon said false and fraudulent representations, omissions, and concealments, and to continue to expose herself to the dangers inherent in the use of the PRODUCTS.

190.    Plaintiff reasonably relied upon the aforementioned fraudulent representations, omissions, and concealments made by the Defendants regarding the nature of the PRODUCTS.

191.     As a direct and proximate result of Defendants' overt unlawful acts regarding the nature of the PRODUCTS which were made pursuant to and in furtherance of a common scheme, and Plaintiff's reliance thereon, Plaintiff suffered and continues to suffer from the injuries and damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorney fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants and PCPC in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT XIII – PUNITIVE DAMAGES
### (Against All Defendants)

192.     Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

193.     Plaintiff is entitled to punitive damages because Defendants' wrongful acts and/or omissions were attended by circumstances of fraud, malice, or willful and wanton conduct, and done heedlessly or recklessly, without regard to consequences or the rights and safety of others, particularly Plaintiff.  Such conduct includes, but is not limited to the following:

a.     At all relevant times, Defendants knew of the PRODUCTS' defective nature, as set forth herein, but continued to design, formulate, manufacture, market, and sell the PRODUCTS to maximize sales and profits at the expense of the health and safety of the consuming public, including Plaintiff, and in conscious disregard of the foreseeable harm caused by the PRODUCTS;

b.     At all relevant times, despite their knowledge of the risk of ovarian cancer associated with the PRODUCTS, Defendants failed to disclose this risk through marketing and promotional efforts and product labeling;

c.      At all relevant times, Defendants continued to promote the PRODUCTS as

safe for perineal use and failed to provide adequate warnings regarding the risk of

developing ovarian cancer if using the PRODUCTS in the perineal area;

d.      At all relevant times, Defendants had knowledge of safer alternative designs

for the PRODUCTS and failed to substitute such safer design.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants

and PCPC in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein

and such further and other relief as the Court deems just and appropriate.

## ACCRUAL OF THE CAUSES OF ACTION

194.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if

fully set forth herein.

195.    Plaintiff had no knowledge of the cause in fact of her injury nor did she have any

evidence of wrongdoing on the part of Defendants until January 2019.

196.    Additionally, Defendants acts of fraudulent concealment of the cancer risks of and

the constituents in the PRODUCTS alleged herein operated to equitably toll the applicable statute

of limitations.

## DAMAGES AND PRAYER FOR RELIEF

197.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if

fully set forth herein.

198.    WHEREFORE, Plaintiff seeks judgment in her favor against the Defendants as

follows:

a.      Severe impairment to her ovaries and reproductive system;

b.      Medical expenses;

    c.       Pain and suffering;

    d.       Mental anguish, anxiety, and discomfort;

    e.       Lost wages and income;

    f.       Fear of cancer or other related diseases;

    g.       Physical impairment;

    h.       Physical disfigurement;

    i.       Loss of enjoyment of life;

    j.       Loss of consortium;

    k.       Pre and post judgment interest;

    l.       Exemplary and punitive damages in an amount to be determined at trial;

    m.       Treble damages;

    n.       General damages;

    o.       Reasonable and necessary attorneys' fees and other disbursements and expenses of this action;

    p.       Such other relief to which Plaintiff may be justly entitled; and

    q.       Any and all other damages to be shown at trial.

WHEREFORE, Plaintiff, Antoinette Tarczy, prays for judgment against the Defendants, individually and collectively, in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

Dated: April 22, 2020              RESPECTFULLY SUBMITTED,

                              ASHCRAFT & GEREL, LLP

                              BY:    /s/ Michelle A. Parfitt
                                     Michelle A. Parfitt (D.C. Bar No. 358592)
                                     James F. Green (D.C. Bar No. 214965)

1825 K Street, Suite 700, NW
Washington, DC 20006
(703) 931-5500
mparfitt@ashcraftlaw.com
jgreen@ashcraftlaw.com


BEASLEY, ALLEN, CROW, METHVIN, PORTIS
& MILES, PC

BY:   /s/ P. Leigh O'Dell
      P. Leigh O'Dell
      Ted G. Meadows
      Post Office Box 4160
      Montgomery, Alabama 36103
      (334) 269-2343
      leigh.odell@beasleyallen.com
      ted.meadows@beasleyallen.com

**Counsel for Plaintiff**


**<u>JURY DEMAND</u>**

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES.**

/s/ Michelle A. Parfitt
Michelle A. Parfitt (D.C. Bar No. 358592)
James F. Green (D.C. Bar No. 214965)
1825 K Street, Suite 700, NW
Washington, DC 20006
(703) 931-5500
mparfitt@ashcraftlaw.com
jgreen@ashcraftlaw.com